J. M. STONE ET AL., RAILROAD COMMISSIONERS, *v.* YAZOO AND MISSISSIPPI VALLEY RAILROAD COMPANY.

1. RAILROAD SUPERVISION. *Regulation of charges. Power of State. Sec. 8, Art. 1, Constitution United States.*

   The State has the power, originally, to prescribe for a railroad company created by it, the rates of compensation to be charged by the company for carrying passengers and freights within its borders, and any exercise of this power which does not hinder or burden interstate commerce or obstruct the freedom thereof by discriminating against persons or property of other States is not a violation of § 8, Article 1, of the Constitution of the United States, which vests in Congress the power " to regulate commerce among the States."

2. SAME. *Grant of right to fix charges. Inviolable contract.*

   But where the State by a charter act has granted to a railroad company the right to fix within maximum limits the rates at which it will transport persons and property over its road, such grant must be treated as a contract, which, under § 9, Article 1, of the State Constitution, and § 10, Article 1, of the United States Constitution, the State cannot violate by interfering with the charges established by the company, if within the prescribed limits.

3. SAME. *Grant of authority to fix rates. Presumption. Express terms.*

   A grant to a railroad company, in general terms, of authority to fix its rates of compensation is not a renunciation of legislative power to secure reasonable rates. Every presumption is against such renunciation. But where it is clear that the legislature intended to partially renounce such control

by conferring upon the company the right to fix its rates within limits, the fixing of such limits, in the charter, is a specification of what will be a reasonable exercise of the authority conferred, and is to that extent a renunciation of the State's control.

4. RAILROAD SUPERVISION. *Charter rights of company. Commission to supervise. Scope of its authority.*

Even where the right of a railroad company to regulate its charges for passengers and freights is secured by its charter, the State may create a commission or other agency to supervise the operations of such road to see that the company keeps within its charter limits, and to enforce such police or other reasonable regulations as the State may see fit to adopt for the government of the road, within the State, in the interests of the community, and consistent with the full enjoyment of the company's contract rights.

5. SAME. *Company protected by charter. Supervisable in certain particulars.*

Though a railroad company's right to regulate its charges for freight and passengers be protected by its charter, still the legislature may require such company to submit to a supervisory commission its tariff of charges, in order that the latter may see whether it conforms to the limits fixed by its charter, and may authorize such commission to prevent unjust discrimination or partiality not authorized by the company's charter, and to hear complaints in respect thereto, and may require the company to give notice to the commission of any accident to a train attended with serious personal injury, and may require the company to keep suitable reception-rooms at each depot, and to have bulletin boards denoting the arrival and departure of trains.

6. SAME. *Act creating a commission. Constitutionality thereof*

A legislative enactment creating a railroad commission and empowering it to supervise railroads is not violative of the Fourteenth Amendment to the Constitution of the United States, or of any provision of the Constitution of this State.

APPEAL from the Chancery Court of Madison County.

HON. E. G. PEYTON, Chancellor.

An act of the legislature of the State of Mississippi, approved February 17, 1882, entitled, "An act incorporating the Yazoo and Mississippi Valley Railroad Company and declaring its powers," contained the following among other sections :

"SEC. 6. *Be it further enacted,* That said company shall have and possess the power of fixing, from time to time, by its board of directors, the rates at which it will do express and telegraph business, and shall transport other express companies as may apply

for transportation over its line, at a just and reasonable rate of compensation, and also the rates at which said company will transport persons or property over its railroads and branches ; *provided,* said last-mentioned rates shall not exceed four cents per mile for each passenger, nor exceed the following rates of freight : sixty-five cents per hundred pounds for transporting first or second class freights, one hundred miles or less ; forty-five cents per hundred pounds for transporting third or fourth class freights, one hundred miles or less; thirty-two cents per hundred pounds for transporting fifth or sixth class freights, one hundred miles or less (reference being had herein to the classification of freights now recognized and observed on the existing railroad line between New Orleans and Jackson, Mississippi). But in no case shall the railroad company be limited to a less charge than twenty-five cents for the transportation of any passenger, parcel, package, or article, however short the distance. The rates so established from time to time by the said board of directors for transporting persons or property as a railroad company, not exceeding the maximum rates for railroad business as above set out, may be charged and collected by said company.

" *Provided further,* that as to lumber, coal, iron, salt, machinery, fertilizers, bricks, lime, agricultural implements, steam engines and boilers, and other freights transported in car loads, rates may be made by special agreements between the shippers and the company for such sum as they may agree upon ; but in all such cases the same rates shall be given to any shipper of an equal quantity at the same time, under similar circumstances, of similar freights between the same points. Nothing herein contained shall prevent the railroad company from making such reduction of rates below the maximum herein fixed as it may elect to do for the purpose of fostering, aiding, and developing the resources of the country penetrated by its railroads and branches."

After this charter act had been accepted, and the company thereby incorporated had built and put in operation a railroad from the City of Jackson to Yazoo City, both terminal points being in this State, the legislature passed an act, which was

62 MISS.—39

approved by the governor, on the 11th of March, 1884, entitled, " An act to provide for the regulation of freight and passenger rates on railroads in this State, and to create a commission to supervise the same, and for other purposes." Of the many provisions of the last-mentioned act only the following seem to have been considered in the opinion in this case or to have any bearing upon the views announced by the court :

" SEC. 4. *Be it further enacted,* That a commission is hereby created to consist of three commissioners, whose qualifications shall be the same as the general qualifications required by law for other State officers, to be known as the Railroad Commission of the State of Mississippi, whose term of office shall be two years and until their successors are appointed and qualified ; and said commissioners shall each take the oath prescribed by law for other State officers, and give bond in the sum of ten thousand dollars, payable to the State of Mississippi, with two or more good sureties, to be approved by the governor, for the faithful performance of their duties as such commissioners, and said bond shall be filed in the office of the secretary of state ; and thereupon the governor shall issue commissions accordingly."

Section 5 contains the provision that "immediately after the passage of this act, the governor, with the advice and consent of the senate, shall appoint said railroad commissioners ;" and § 26 provides that " hereafter the selection of railroad commissioners shall be at such time, in such manner, and for such term as may be determined by the legislature."

" SEC. 6. *Be it further enacted,* That it shall be the duty of all persons or corporations who shall own or operate a railroad in this State, within thirty days after the passage of this act, to furnish the commissioners with its tariff of charges for transportation of every kind, and it shall be the duty of said commission to revise said tariff of charges so furnished, and determine whether or not, and in what particular, if any, said charges are more than just compensation for the services to be rendered, and whether or not unjust discrimination is made in such tariff of charges against any person, locality, or corporation, and when said charges are corrected,

as approved by said commission, the commission shall then append a certificate of its approval to said tariff of charges, but in revising or establishing any and every tariff of charges it shall be the duty of said commission to take into consideration the character and nature of the service to be performed, and the entire business of such railroad, together with its earnings from the passenger and other traffic, and so revise such tariffs as to allow a fair and just return on the value of such railroad, its appurtenances and equipments; and it shall be the duty of said commission to exercise a watchful and careful supervision over every such tariff of charges, and continue such tariff of charges from time to time as justice to the public and each of said railroad companies may require, and to increase or reduce any of said rates according as experience and business operations may show to be just; and said commission shall accordingly fix tariffs of charges for those railroads failing to furnish tariffs as above required. And it shall be the duty of said railroad companies or persons operating any railroad in this State to post at each of its depots all rates, schedules, and tariffs for the transportation of passengers and freights, made or approved by said railroad commission, with said certificate of approval, within ten days after said approval, in some conspicuous place at such depot; and it shall be unlawful for any such person or corporation to make any rebate or reduction from such tariff in favor of any person, locality, or corporation which shall not be made in favor of all other persons, localities, or corporations by a change in such published rates, except as may be allowed by the commission, and when any change is contemplated to be made in the schedule of passenger or freight rates of any railroad by the commission, said commission shall give the person or corporation operating or managing the same notice in writing, at least ten days before such change, of the time and place at which such change will be considered.

"SEC. 7. *Be it further enacted,* That any person or corporation, as aforesaid, who shall make any reduction or rebate prohibited by this act, without the approval of the commission, shall be guilty of a misdemeanor, and upon conviction shall be fined no less than ten nor more than five hundred dollars.

" SEC. 8. *Be it further enacted,* That this act shall not prevent any railroad company from transporting freight or persons free of charge, or at reduced rates, for any religious, charitable, or benevolent purpose, or for any industrial exposition, fair, or association of a public nature, or for transporting immigrants into this State, or persons prospecting with a view of locating or bringing immigrants into this State, or for pleasure excursions.

" SEC. 9. *Be it further enacted,* That it shall be the duty of said commission to hear all complaints made by any person against any such tariff of rates so approved on the ground that the same, in any respect, is for more than just compensation, or that such charges, or any of them, amount to or operate so as to effect unjust discrimination ; such complaint must be in writing, and specify the items in the tariff against which complaint is made, and if it appears to the commission that there may be justice in the complaint, or that the matter ought to be investigated, the commission shall forthwith furnish to the person or corporation operating the railroad a copy of the complaint, together with notice—which said notice shall be served as other legal process is now required by law to be served on railroad companies—that at a time and place stated in the notice, the tariff as to said items will be revised by the commission, and at such time and place it shall be the duty of the commission to hear the parties to the controversy in person or by counsel or both, and such evidence as shall be offered, oral or in writing, and may examine witnesses on oath, conforming to the mode of proceeding, as nearly as may be convenient, to that required of arbitrators, giving such time and latitude to each side, and regulating the opening and conclusion of any argument, as the commission may consider best adapted to arrive at the truth, and when the hearing is concluded the commission shall give notice of any change deemed proper by them. to be made to the person or corporation operating the railroad : *Provided,* In no instance shall any corporation, railroad, or person be criminally or civilly liable for the making of any charge or discrimination whatever, if the same is not in violation of the tariff of charges or rules and regulations prescribed by the commission."

" SEC. 12. *Be it further enacted,* That every person or corporation operating a railroad in this State shall furnish the said commission with all the information required relative to the management of their respective lines, and particularly with copies of all leases, contracts, and agreements for transportation with express, sleeping-car, or other companies to which they are parties.

" SEC. 13. *Be it further enacted,* That every railroad company shall, within twenty-four hours after the occurrence of any accident to a train attended with serious personal injury on any portion of its line within the limits of this State, give notice of the same to the railroad commissioners, who, upon information of such accident, may repair or dispatch one or more of their number to the scene of said accident, and inquire into the facts and circumstances thereof, which shall be recorded in the minutes of their proceedings and embraced in their annual report."

" SEC. 15. *Be it further enacted,* That it shall be the duty of every railroad company or person operating a railroad in this State to make quarterly returns of the business of said railroad to the railroad commission of Mississippi, which returns shall embrace all the receipts and expenditures of said railroad, and to be made according to forms furnished by the said railroad commissioners for that purpose.

" SEC. 16. *Be it further enacted,* That the quarterly returns herein provided shall be made as aforesaid within thirty days after the end of each quarter to which they relate, and any railroad company, or persons operating any railroad in this State, which shall fail or refuse to make the quarterly returns as provided for in this act, shall forfeit to the State of Mississippi fifty dollars for every day of such refusal or neglect.

" SEC. 17. *Be it further enacted,* That the said quarterly returns shall be sworn to by one or more officers of said company, or of the persons operating said railroad, who has knowledge of their truth, and any person knowingly swearing falsely to any statement in any of said quarterly reports shall be guilty of perjury.

" SEC. 18. *Be it further enacted,* That it shall be the duty of the commissioners to inspect the depots of the railroads operated in this

State and see that at least one comfortable and suitable reception-room is provided at each depot for the use and accommodation of persons desiring and awaiting transportation over their line, and any railroad company failing or refusing to provide such room, after sixty days' notice from the commissioners to provide the same, shall be liable to a penalty of not less than fifty dollars for each day they so fail or refuse to provide such room; and said railroad company shall keep at all times in such reception-rooms a bulletin-board which shall show the time of the arrival and departure of trains, and when any passenger-train or other train for transporting passengers is delayed, notice of same shall be made on said bulletin-board for the information of passengers, stating as nearly as can be ascertained the extent of the delay and probable time of arrival."

"SEC. 23. *Be it further enacted,* That if any railroad company or person or corporation operating any railroad in this State shall violate any of the provisions of this act or the tariff of charges as fixed by said commission, such company, person, or corporation shall be liable to a penalty of five hundred dollars for each violation not otherwise provided for, and such penalty may be recovered by an action to be brought in the name of the State of Mississippi in any county where such violation may occur or injury or wrong be done. The commission shall institute such action through the district attorney of the proper district, and no such suit shall be dismissed without the consent of the court and of said commission; and if any district attorney shall neglect for thirty days after notice to bring any such suit, the commission may direct some attorney-at-law to bring the same, and his fee therefor shall be fixed by the court and shall not exceed fifty per cent. of the amount collected; and the district attorney shall not interfere in such suit, and the same shall not be dismissed without consent as aforesaid; *provided* that in all trials of cases brought for a violation of any tariff of charges as fixed by the commission it may be shown in defense that such tariff so fixed was unjust.

"SEC. 24. *Be it further enacted,* That the remedies hereby given shall be regarded as cumulative to the remedies now given by law

against railroad corporations, and this act shall not be construed as repealing any statute giving such remedies."

In pursuance of this act, the governor appointed, and the senate confirmed, J. M. Stone, W. B. Augustus, and William McWillie as railroad commissioners, and each qualified according to the requirements of the act.    And thereupon the Yazoo and Mississippi Valley Railroad Company filed the bill in this case against such railroad commissioners, alleging that the act creating the "railroad commission" is void because it violates § 8, Art. 1, of the Constitution of the United States, which confers upon Congress the right " to regulate commerce with foreign nations and among the several States," and § 9, Art. 1, of the State Constitution, and § 10, Art. 1, of the Constitution of the United States, which prohibit, respectively, the enactment of any " law impairing the obligation of contracts," and that clause of the Fourteenth Amendment to the Constitution of the United States, which is in these words: " Nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws."    The prayer of the bill is for a "writ of injunction directed to the defendants and each of them, enjoining and restraining them, their agents, attorneys, and all others under their authority, from interfering with the tariff of charges of your orator or with the operation, control, or income of said railroad or any part thereof, under or by virtue of said act of the State of Mississippi, approved March 11, 1884, and commanding that they and each of them do absolutely desist and refrain from issuing, promulgating, or enforcing any revision of your orator's tariff, or from instituting or aiding in the prosecution of suits for recoveries of penalties under said acts, or from doing anything, directly or indirectly, under said act, as to your orator or its railroad or employees."

The defendants demurred to the bill.    The decree of the Chancellor overruled the demurrer, held that the " said railroad supervision law is unconstitutional and void so far as it attempts to divert, impair, or interfere with the chartered rights of the complainant," and granted the prayer of the bill.    From this decree the defendants appealed.

*J. W. C. Watson*, for the appellants.

1. Complainants urge that for the State to regulate railroad charges would be a violation of § 8, Art. 1, of the Federal Constitution, which declares : " The Congress shall have power to regulate commerce with foreign nations, and among the several States, and with Indian tribes."

The power to regulate commerce was conferred upon Congress that it might be protected against hostile legislation by the States. A State law, necessarily embarrassing, encumbering, or obstructing commerce, would be unconstitutional; but the laws in question were not designed for any such purpose, and have, not necessarily, any such effect. On the contrary, their object is to encourage and promote commerce by protecting it against unreasonable charges and unjust discrimination. No decision has ever been made by the supreme court holding a State law to be in conflict with the power of Congress to regulate commerce, unless such law imposed a tax or duty or restraint or prohibition upon commerce. Referring to wharfage—" which is the compensation which the owner of a wharf demands for the use thereof," the supreme court, in the case of *Packet Co.* v. *Keokuk*, 95 U. S. 88, says :

" It is in no sense a regulation of commerce between the States. * * * Nor is it in conflict with the act of Congress respecting the enrollment and license of vessels for the coasting trade. All these objections rest upon the mistaken assumption that port charges, and especially wharfage, are taxes, duties, and restraints of commerce."

And so, too, the objection that charges for railroad transportation, whether regulated by the corporation or by the State, are an unconstitutional interference with commerce, rests " upon the mistaken assumption that they are *taxes, duties, and restraints of commerce.*" As to wharfage charges, see *Packet Co.* v. *St. Louis*, 100 U. S. 423 ; *Vicksburg* v. *Tobin*, 100 U. S. 430.

" And it may be safely admitted, also, that it is within the power of the State to regulate this compensation *so as to prevent extortion,* a power which is very often properly delegated to the local municipal authority." 95 U. S. 86.

It is indeed difficult to comprehend how it is that a railroad corporation, under the authority of a State law, can regulate its charges, whilst at the same time it would be unconstitutional for the State itself to exercise this power.   This is to make the stream rise higher than its source—to make the creature greater than its creator. . This power would certainly be no more dangerous to the interests of commerce in the hands of the State than in the hands of the corporation, and yet the proposition is that the corporation may constitutionally exercise it, but the State cannot.

Pilotage, which is a charge for conducting a vessel from sea into port, and which might be abused to the obstruction of commerce, is allowed under State laws.   *Wilson* v. *McNamee*, 102 U. S. 572. The States, too, are permitted to erect bridges and dams across navigable rivers flowing beyond their own limits, provided they are not intended to embarrass commerce, and do not necessarily have that effect.   *Wilson* v. *Blackbird Creek Marsh Co.*, 2 Peters 245, decided in 1829 ; *Gilman* v. *Philadelphia*, 3 Wallace 713, decided in 1865, and *Escanaba Co.* v. *Chicago*, 107 U. S. 678, decided in 1882.   These navigable streams passed out of the States, respectively, and connected with other navigable waters higher up.

" The exercise of power on the part of a State is very different from the imposition of a tax or duty upon the movements or operations of commerce between the States.   Such an imposition, whether relating to persons or goods, we have decided the States cannot make, because it would be a regulation of commerce between the States in a manner in which uniformity is essential to the rights of all, and, therefore, requiring the exclusive legislation of Congress.   It is a tax because of the transportation, and is, therefore, virtually a tax on the transportation, and not in any *sense a compensation therefor*, or for the franchises enjoyed by the corporation that performed it."   21 Wall. 472.

Here is plainly recognized the distinction upon which we insist, to wit : That while a tax or direct restraint upon transportation by a State is unconstitutional, a compensation therefor, whether regulated by the corporation or the State, is not unconstitutional.

The cases of *Peik* v. *Chicago and Northwestern Railway Co.* and *Lawrence* v. *Same*, 94 U. S. 164, are, we submit, decisive of the question before the court.

The law of Wisconsin, construed in these cases, and the Mississippi law under consideration, are in substance the same. Each makes provision for the regulation of railroad charges within its respective jurisdiction. Each of said laws, however, exempts from its operation all freights which come from beyond the boundaries of the State, to be carried across or through the State. Wisconsin Law, 18th section; Mississippi Supplemental Act.

The Chicago and Northwestern Railroad Company, in these cases, like the complainant in the case now before the court, was a railroad running through several States under the same name and same management, and, like the present complainant, under a separate charter from each of the several States.

Chief Justice Waite, delivering the opinion of the court in these Wisconsin cases, says :

" These suits present the single question of the power of the legislature of Wisconsin to provide by law for a maximum of charges to be made by the Chicago and Northwestern Railroad Company for fare and freight upon the transportation of persons and property carried within the State, *or taken up outside the State and brought within it, or taken up inside and carried without.*" 94 U. S. 175.

To this question the court gave an emphatic and affirmative answer, and thereby upheld the law of Wisconsin regulating railroad fares, of which the law of Mississippi is but the counterpart. These Wisconsin decisions, we concede, have no bearing upon the right to regulate their own charges alleged to be derived from charter contract, as relied upon by the complainants. This contract question we shall consider in its place.

In its opinion in these Wisconsin cases the court says:

" In *Munn* v. *Illinois, supra*, p. 113, and *Chicago, Burlington and Quincy Railroad Co.* v. *Iowa, supra*, p. 155, we decided that the State may limit the amount of charges by railroad companies for fares and freights, unless restrained by some contract

in the charter, even though their income may have been pledged as security for the payment of obligations incurred upon the faith of the charter." P. 176.

Under a distinct head, the court says further :

" As to the effect of the statute as a regulation of inter-State commerce, the law is confined to State commerce or such inter-State commerce as directly affects the people of Wisconsin. Until Congress acts in reference to the relations of this company to inter-State commerce, it is certainly within the power of Wisconsin to regulate its fares, etc., so far as they are of domestic concern. With the people of Wisconsin this company has domestic relations. Incidentally, these may reach beyond the State, but certainly, until Congress undertakes to legislate for those who are without the State, Wisconsin may provide for those within, even though it may indirectly affect those without." 94 U. S. 177–8.

We submit that there are no less than ten decisions of the Supreme Court of the United States overruling the position relied upon by the complainants, that State regulation of railroad charges for transportation is in conflict with the power of Congress to regulate commerce among the States. *Munn* v. *Illinois,* 94 U. S. 113 ; *Chicago, etc., Co.* v. *Iowa,* Ib. 155 ; *Peik* v. *Chicago, etc., Railway Co.,* Ib. 164; *Chicago, etc., Railroad Co.* v. *Ackley,* Ib. 179 ; *Winona and St. P. Railroad Co.* v. *Blake,* Ib. 180 ; *Southern M. Railroad Co.* v. *Coleman,* Ib. 181 ; *Stone* v. *Wisconsin,* Ib. 181; *Shields* v. *Ohio,* 95 U. S. 319 ; *Ruggles* v. *Illinois,* 108 U. S. 526 ; *Illinois Central Railroad Co.* v. *Illinois,* Ib. 541.

The Supreme Court of the United States has also expressly decided that the regulation of the fares and freights of railroads by a State is not a violation of the Fourteenth Amendment to the Constitution of the United States. 94 U. S. 123–4, 134–5. " The appropriate regulation of the use of property is not taking property within the meaning of the constitutional prohibition." *Railroad Co.* v. *Richmond,* 96 U. S. 521–529. Subsequent cases : *Chicago, Milwaukee and St. Paul Railroad Co.* v. *Ackley ; Winona and St. Peter Railroad Co.* v. *Blake ; Southern Minnesota Railroad*

*Co.* v. *Coleman*; *Stone* v. *Wisconsin*, all in 94 U. S. 179–181; *Illinois Central Railroad Co.* v. *Illinois*, 108 U. S. 545, all follow and reaffirm the principle held in *Munn* v. *Illinois, Chicago, Burlington and Quincy Railroad Co.* v. *Iowa, Peik* v. *Chicago, etc., Railway Co., supra.*

2. Complainants insist that the act of the Mississippi legislature violates § 10, Art. 1, of the Federal Constitution, and § 9, Art. 1, of the Constitution of the State. The language of the Federal Constitution is : " No State shall pass any law impairing the obligation of contracts." That of the State Constitution : " No law impairing the obligation of contracts shall be passed."

We maintain that the regulation of railroad charges falls under the police power of the States, a power which originally belonged to the States and was never surrendered by them. 94 U. S. 645 ; *City of New York* v. *Miln*, 11 Peters 102 ; *Fertilizing Co.* v. *Hyde Park*, 97 U. S. 667 ; *Patterson* v. *Kentucky*, 97 U. S. 503.

" State legislation strictly and legitimately for police purposes does not in the sense of the constitution necessarily intrench upon any authority which has been confided, expressly or by implication, to the National Government." 97 U. S. 504. " That power (police) belonged to the States when the Federal Constitution was adopted. They did not surrender it, and they have it now. It extends to the entire property and business within their local jurisdiction. Both are subject to it in all proper cases." 97 U. S. 667. All agree that the legislature cannot barter away the police power of the State. Irrevocable grants of property and franchises may be made if they do not impair the supreme authority to make laws for the right government of the States, but no legislature can curtail the *power of its successors to make such laws as they may deem proper in matters of police.* 34 New York 657 ; *Boyd* v. *Alabama*, 94 U. S. 645.

" Many attempts have been made in this court and elsewhere to define the police power, but never with entire success. It is always easier to determine whether a particular case comes under the general scope of the power, than to give an abstract definition of

the power itself which will be in all respects correct." *Stone* v. *Mississippi*, 101 U. S. 817–18 ; 111 U. S. 746–47.

Pierce on Railroads says : " The State may, in the exercise of its police power, require reports, the numbering of cars, the fixing and posting of routes, a slow rate of movement, the disuse of steam in cities, the ringing of a bell and blowing of a whistle on approaching highways, the stationing of a flagman at highway crossings, the lighting of the railroad in cities and villages, the stopping of trains for a certain time at stations, and affix penalties or a liability for injuries in case of non-compliance." *State* v. *Southern Pacific Railroad Co.,* 24 Tex. 80 ; *Frankford and P. Pass. Railroad Co.* v. *Philadelphia,* 58 Pa. St. 119 ; 63 Ill. 91 ; 66 Ill. 43 ; 67 Ill. 113 ; 34 Ind. 392 ; 38 Wis. 463 ; 41 Wis. 44. Many other legislative regulations of railroads not affecting the public health or morals have been sustained by the courts. Pierce on Railroads 463–65.

The case of *Railroad Co.* v. *Fuller,* 17 Wall. 560, was this:

" A statute of Iowa " in relation to the duties of railroad companies, passed in 1862, enacts :

" In the month of September, annually, each railroad company shall fix its rates of fare for passengers and freights for transportation of timber, wood, and coal per ton, cord, or thousand feet, per mile, also its fare and freights per mile for transporting merchandise and articles of first, second, third, and fourth grades of freight."

And on the first day of October following shall put up at all the stations and depots on its road a printed copy of such fare and freights, and cause a copy to remain posted during the year.

" For willfully neglecting so to do, or for receiving higher rates of fares or freights than those posted, the company shall forfeit not less than one hundred dollars or more than two hundred dollars to any person injured thereby and suing therefor."

This legislation was sustained by the Supreme Court of the United States.

" It is," says the court, " a police regulation, and as such forms a portion of the immense mass of legislation which embraces everything within the territory of a State not surrendered to the general

government, all which can be most advantageously exercised by the States themselves." 17 Wall. 568.

In the Passaic Bridge cases, Appendix to 3 Wall. 782, 790, 793, decided on the circuit by Mr. Justice Grier of the supreme court, and affirmed by the supreme court, it is held :

" That the constitution does not require the State to surrender her control   *   *   *   over the highways   *   *   *   either by land or water, provided all citizens of the United States enjoy the same privileges which are enjoyed by her own." 3 Wall. 793.

In the same case the court says :

" *That the police power of the State includes the regulation of highways and bridges within its boundaries has never been questioned.*" 3 Wall. 790.

" Railroads are public highways." 63 Maine 269 ; 18 Am. R. 208 ; *Olcott* v. *The Supervisors,* 16 Wall. 678. That railroads, though constructed by private corporations and owned by them, are public highways has been the doctrine of nearly all the courts ever since such conveniences for passage and transportation have had an existence. 16 Wall. 694.

There are, no doubt, charter contracts and other legislative contracts, but what we maintain is that the legislature cannot confer upon a railroad an irrepealable and unchangeable right to regulate its own charges.

" Common carriers, railroads included, exercise a sort of public office, and have duties to perform in which the public is interested. *New Jersey Navigation Co.* v. *Merchants' Bank,* 6 How. 382. Their business is, therefore, ' affected with a public interest' within the meaning of the doctrine which Lord Hale has so forcibly stated." 94 U. S. 130.

In the case of the *East Hartford* v. *The Hartford Bridge Co.,* 10 Howard 511, 533–4, the supreme court says :

" The parties to this grant, (the Hartford Bridge Company,) did not by their charter stand in the attitude toward each other of making a contract by it, such as is contemplated in the constitution, and as could not be modified by subsequent legislation. The legislature was acting here on the one part, and public municipal

and political corporations on the other. They were acting, too, in relation to a public object, being virtually a highway across the river over another highway up and down the river. From the standing and relation of these parties, and from the subject-matter of their action, we think that the doings of the legislature as to this ferry must be considered rather as public laws than as contracts. They related to public interests. They changed as those interests demanded." 10 Howard 533–4.

The principles of the foregoing case are reaffirmed. *Newton* v. *Commissioners*, 100 U. S. 548, 558. The facts of this case are these:

By an act of the Ohio legislature a new county was established, one provision of the law being that the town of Canfield should be the permanent county-seat, on condition that its citizens, at their own cost, would furnish a suitable lot and erect upon it the necessary public county buildings at a cost of not less than five thousand dollars. These terms were complied with, and the lot and buildings accepted by the commissioners appointed under the law to act in the matter. Several years afterward, the county-seat, against the protest of the citizens, was removed, and on a bill filed alleging that the law authorizing the removal was one impairing the obligation of a contract, and therefore null and void, the court held that it related to a public or governmental matter, and was therefore constitutional and operative. See also *Armstrong* v. *The Commissioners*, 4 Black. (Ind.) 208 ; *Adams* v. *The County of Logan*, 11 Ill. 336 ; *Bass* v. *Fanthroy*, 11 Texas 698.

In this case of *Newton* v. *Commissioners* the court, after stating several subjects in regard to which it says, " the legislative powers of a State are of an absolute character," adds :

" In all these cases there can be no contract and no irrepealable law, because they are ' governmental subjects,' and hence within the category before stated.

" They involve public interests, and legislative acts concerning them are necessarily public laws. Every succeeding legislature possesses the same jurisdiction and power with respect to them as its predecessors. The latter have the same power of repeal and

modification which the former had of enactment, neither more nor less. All occupy in this respect a footing of perfect equality. This must necessarily be so in the nature of things. It is vital to the public welfare that each one should be able at all times to do whatever the varying circumstances and present exigencies touching the subject involved may require. A different result would be fraught with evil." 100 U. S. 559.

It is thus seen that legislation in relation to a public object, a governmental matter, or subject involving public interests, must necessarily be of the character of a public law, and that in these cases there can be no contract and no irrepealable law.

Now railroads, we submit, as to their charges, belong to the category above stated.

In the case of *Railroad Commissioners* v. *Portland and Oxford and Central Railroad Co.*, 63 Maine 269 (18 Am. R. 208–10), the court says:

" Nor does the ownership of railroads, whether it be in the State or a private corporation, affect the nature of their use, since in either case the function to be exercised and the uses to be subserved are public."

" Neither does it make any difference in this respect that private individuals cannot use their own rolling stock upon railroads. The use is one thing and the mode of use is another. The use being public does not become private from the mode of use; that is exclusively within the discretion of the legislature, and whether the railroad corporation, the public, or the State have authority under the charter to put on and use rolling stock, the use of the road is, nevertheless, public. The public character of railroads further appears from the authority granted to them to exercise the right of eminent domain. No such right is ever granted to banking, manufacturing, or insurance corporations, or to academies, colleges, or hospitals established and conducted by private individuals or private corporations. It is solely because the use of railroads is public that this distinction is made. So, too, upon the same ground of public use the legislature may authorize municipal corporations to aid in building railroads by taking stock in railroad corporations

and paying for the same by municipal taxation, a power denied to all municipalities in respect to purely private corporations."

The conclusion, therefore, is that railroads, whether built, owned, or conducted by the State or private corporations, and whether exacting tolls or free, are public highways. *Olcott* v. *Supervisors*, 16 Wall. 678 ; *Belfast and Moosehead Lake R. R. Co.* v. *Brooks*, 60 Me. 569 ; *Allen* v. *Jay*, Ib. 124; 63 Me. (18 Am. R. 210).

*J. W. C. Watson* also made an oral argument.

*James Fentress*, for the appellee.

1. The Mississippi Railroad Commission Act, approved March 11, 1884, impairs the obligation of the charter contract between the complainant and the State of Mississippi, approved February 17, 1882.    6 Cranch 136 ; 9 Cranch 50 ; 2 Peters 657 ; 3 Story, Com. on Const., §§ 1371–1379 ; *Dartmouth College* v. *Woodward*, 4 Wheaton 657 ; 3 Wall. 73 ; 13 Wall. 266 ; 101 U. S. 816 ; 94 U. S. 161 ; 52 N. H. 447 ; *McDuffy* v. *Railway Co.*, 35 Wis. ; *Attorney General* v. *Railway Co.*, 21 Am. R. 401.

2. It is a usurpation of the power over commerce delegated to the United States and surrendered by the States, and is a violation of Art. 1, § 8, of the Federal Constitution.    1 Elliott's Debates 148–9 ; 2 Madison Papers 695 and 732, 632 and 711 ; 1 Elliott's Debates 151, 184, 185, 209, 215, 238, 239, 258, 277, 278, 288, 308, 312, 336 ; Federalist, No. XXII, 104, 105, also 33 and 56, 211, 201 ; 9 Writings of Washington, by Sparks, 146, 501, 11, 122, also 140, 141, 161, 162, 183 ; McMaster's History of the People of the United States 206.

Compare Articles of Confederation, article 9, with our present constitution.    *Hall* v. *De Cuir*, 95 U. S. 485; *Welton* v. *Missouri*, 91 U. S. 275 ; *Railroad Co.* v. *Husen*, 95 U. S. 469 ; 2 Story's Com. on Const., § 1063 ; *Kaiser* v. *Railway Co.*, 18 Fed. Rep. 153.

3. It is in violation of the Fourteenth Amendment of the Constitution of the United States, in that it denies the equal protection of the laws to common carriers by railroad, and deprives them of property rights without due process of law.

It is also in violation of §§ 2, 8, 10, 12, and 28 of Art. 1 of

the Constitution of the State of Mississippi. Magna Charta, ch. 29; 1 Thomas' Coke, side pages 21 and 22; *People* v. *Toynbee*, 20 Barb. (N. Y.) 199; *Winehamer* v. *People*, 3 Kernan (N. Y.) 446; *Plimpton* v. *Somerset*, 33 Ver. 293; *Francis* v. *Baker*, 11 R. I. 107; *State* v. *Beswick*, 13 R. I. 218; *State* v. *Staten*, 6 Coldwell (Tenn.) 244; *Knox* v. *State*, 9 Baxter (Tenn.) 207; *Bank* v. *Cooper*, 2 Yerger (Tenn.) 603; *Kirkpatrick* v. *State*, Meigs (Tenn.) 124; 1 Kent Com. 601; *Westervelt* v. *Gregg*, 12 N. Y. 209; Cooley Const. Lim. 441.

The rule is made to apply to common carrier operating railroad alone, and the *primâ facie* case is based, not on any fact proven, but upon an *opinion* of the commission. Nor is it even the opinion of the commission upon the facts proven in a lawsuit, but their general opinion as to a general tariff of rates, in advance and without proof of service performed or its reasonable value. *San Mateo* v. *R. R. Co.*, 8 Am. and Eng. R. R. Cases 23; *Santa Clara* v. *R. R. Co.*, 18 Fed. Rep. 385; *Van Zant* v. *Waddel*, 2 Yerger 270; R. R. Tax Cases, 13 Fed. Rep. 733; 111 U. S. 757, 759; 101 U. S. 30.

4. It is in violation of §§ 1 and 2, Art. 3, and § 1, Art. 4, and § 1, Art. 6, of the Constitution of Mississippi. *State* v. *Armstrong*, 3 Sneed (Tenn.) 656; *Fogg* v. *Bank*, 1 Baxter (Tenn.) 436–7; *Tilman* v. *Cock*, 9 Baxter (Tenn.) 432; Locke on Civil Government, § 142; Cooley Const. Lim. 141; 7 Hump. (Tenn.) 152; 10 Yerger (Tenn.) 59.

*James Fentress* also argued the case orally.

*W. P. Harris*, on the same side.

1. Let us consider the proposition of counsel for appellants, that the regulation of freight and passenger rates is part of the inalienable police power of the State. Mr. Justice Miller, of the supreme court, speaks of this power as "well known, but undefined." Police is the "power to govern men and things," but, in the constitutional systems of the United States, that power which remains unsurrendered and which the State may exert regardless of private right, that is, without resort to the right of eminent domain and without commutation to the party deprived, and which is covered

by the concession which individuals make to the organized community, is a limited power.    Mr. Justice Miller adopts Chancellor Kent's enumeration of the subjects of this power.    And we may safely assume that, with the recognized addition of the penal code and a more enlarged statement of health regulations and protection against vagabonds, paupers, and criminals, we have a fair illustration of the police power which is deemed so essential as not to be subject to diminution by contract.    Citing the definition of this power from Chancellor Kent, he declares : " Unwholesome trades, slaughter-houses, operations offensive to the senses, the deposit of powder, the application of steam power to propel cars, the building with combustible materials, and the burial of the dead, he says, may all be interdicted by law in the midst of dense masses of population, on the general and rational principle that every person ought so to use his property as not to injure his neighbors, and that private interests must be made subservient to the general interest of the community."    *Butchers, etc., Co.* v. *Crescent City, etc.,* 111 U. S. 746.

In the *City of New York* v. *Miln,* 11 Pet. 130, the United States Supreme Court, speaking of the police power of the States, and having regard to a law of the State of New York preventing the landing of paupers, criminals, and persons having infectious diseases, declared that, though the law affected commerce, it was not a law regulating commerce, but the exercise of part of the essential power of the States not surrendered.    In the " License Cases " the power of the State to correct the evils of intemperance by placing restrictions on the sale of intoxicating drinks was upheld.    In *Stone* v. *Mississippi,* 101 U. S. 814, Mr. Justice Waite said that the inalienable police power certainly extends to public health and to public morals, and that the power to suppress lotteries, as a gambling vice, was within it.    It is in this case, decided as late as 1879, that he employs this emphatic language : " The doctrines of *Trustees of Dartmouth College* v. *Woodward,* announced by this court more than sixty years ago, have become so imbedded in the jurisprudence of the United States as to make them, to all intents and purposes, part of the constitution itself."    Public health,

morals, and safety, and the kindred subjects, preventing obstructions to highways, nuisances, public decency, and order, etc., may be taken fairly to characterize the subjects of the internal police power of a State, which its legislature may not surrender by contract. It is not every essential power of government which the State may not surrender or forbear to employ in particular cases— for example, the taxing power. This is an indispensible power, and yet the State may relinquish it partially, says Marshall, Chief Justice. Other government duties may demand that the State, to accomplish a positive public benefit, may consent to forbear the exercise of another power. The power to *make the concession* has been found to be among the most beneficent powers possessed by government.

All the patrotism of all the patriots, all the wisdom of all the statesmen, all the skill of all the financiers who have adorned the history of the United States combined, have not done so much for the growth of the country as railroad enterprise. The transfer of civilized society, with all its appointments, bodily to the distant wilderness, the banishment of famine from the land, the development of boundless resources, the setting in motion of innumerable activities within a decade, are among the achievements. But put the case which is a complete answer to the claim that the power to regulate rates is an inalienable power. To hold that a State which finds that its chief need is the railroad, and that its people are too poor to make them, cannot give the requisite guarantee to capital in order to enlist it, either by giving to it the power to regulate its business, subject only to the common law as administered by the courts in behalf of those who are aggrieved, or by fixing standard rates of freights and fares in the charter, by a contract binding both the State and the company, would be to deprive it of one of its most efficient powers for the general good.

Those who may desire to consult the cases on the points discussed are referred to the following :

On the power of the legislature over charters : *Wales* v. *Stetson,*

2 Mass. 143 ; *Dartmouth College* v. *Woodward,* 4 Wheaton 518 ; *Providence Bank* v. *Billings,* 4 Pet. 560 ; *Planters' Bank* v. *Sharp,* 6 How. 301 ; *Binghamton* v. *Bridgeport,* 3 Wall. 51, 16 How. 369, 18 How. 331, 111 U. S.

On the precise point as to power over railroad rates : *Sloan* v. *Pacific Railroad Co.,* 61 Mo. 24 ; *Attorney General* v. *Railroad Co.,* 35 Wis. 589 ; *Hamilton* v. *Keith,* 5 Bush. (Ky.) 460.

2. *Regulation of the Rates of Transportation as a Regulation of Commerce.*

The experience of the statesmen of the country under the Articles of Confederation fortunately brought out into strong light the natural divisions of the subjects of government into those which are general, as affecting more States than one and which could only be dealt with by an authority which could bind all the States, and those which were local, and concerned but one State. Upon the basis of this natural division the constitution was framed. The States insisted on a specific enumeration of the powers granted to the central government, but the actual scope of these powers is not defined. This is especially true of the commercial power. State regulations legitimately derived from the mass of powers reserved must in many cases affect commerce indirectly. To enable the courts to draw the line between the power which must reside exclusively in Congress and which is denied to the States, they have resorted to the fundamental principles on which the constitution was framed. Is the State regulation confined in its direct operation to a single State ? or does it concern more States than one ? In other words, is it local or general ? If it concerns more States than one, then it requires uniform regulation by a power which can bind both. For this reason, subjects which require a uniform rule, and concern more States than one, fall within the exclusive power of Congress. In this connection it may be stated that the commercial power of Congress has been held to embrace the navigable waters, the paths of commerce, the vessels, vehicles, wharves, pilots, and indeed all the aids of commerce, but that body is not bound to exert its power to its full extent. It might embrace in general regulations the local aids supplied by the

States ; but in the absence of such general regulations, the State regulations are valid and effective within the limits indicated, and to this extent it may be said that the commercial power of Congress is not exclusive. Local regulations flowing from the admitted power of the State over its internal affairs may stand until superseded by Congress. It is to be borne in mind that neither the vehicle, the navigable waters, the wharf, nor the pilot, separately or in the aggregate, constitute the commerce which is to be regulated by Congress alone. That commerce is transportation. " Transportation is commerce itself." This is the language of the Supreme Court of the United States. It is not until the aids, subjects, and elements of commerce are combined in the process of transfer from one State to another or to foreign nations that commerce begins as a subject of regulation. *The Daniel Bull,* 10 Wall. 557. The contract of purchase in New York of a cargo of wheat or tobacco is regulated by State law, as all other sales, and when the cargo reaches England its sale or exchange is governed by the laws of that country. It was never intended that the power of Congress should be exercised over these transactions. So of the purchase of cotton in Mississippi to be shipped for sale or exchange to New Orleans. The purchase and sale or exchange are governed by the laws of the State in which they take place. The purchase takes place before transportation begins and the sale after it ends. The State laws governing contracts of purchase and sale affect traffic, but they are not regulations of commerce. As the mere construction of wharves and artificial harbors as aids to commerce, instrumentalities, and the regulation of the cost of their use are not regulations of commerce, and the contracts of purchase and sale are not embraced by the commercial power, where does the exclusive power of Congress rest? It rests on the process of transfer from one State to another for the purpose of exchange or sale, and manifestly the contract for this transfer between the carrier and the shipper, distinct from the charge on the carrier for the use of facilities, is the very essence of the process of transfer or tranportation, and of the commerce, in short, " among the several States." The authority which can effectually control or regulate on inter-State

lines or highways this contract, acts directly on the transportation and controls it.

To allow the States to control the transfer by fixing the cost is to render the constitution nugatory. The commerce between Mississippi and Louisiana is as much the commerce of the one State as of the other. Delaware cannot regulate the cost of transportation on the canal, that is to say, the contract of carriage. Transportation between points in different States is not a local subject. To allow the States to act by legislation on the contract of carriage between States is to permit States to legislate upon the essential part of the transaction of commerce. On inter-State lines of railroad, or inter-State canals, as the law of one State is limited to its own boundary and cannot prevail beyond it, to legislate upon a contract made by a through carrier on a through line, is to dislocate the line and the contract, or to compel the shipper and carrier to make two contracts to accomplish the transportation on a thoroughfare intended to avoid this embarrassment. If the commercial power is exclusive to any extent, it is exclusive over the process of transfer and over this contract under which it is made. The regulation of this transfer concerns more than one and requires uniformity of regulation, and there is but one authority which can make the regulation effective.

The history of the commerce clause of the constitution and the reasons which led to its adoption abundantly show that it owes its existence, as respects the internal commerce of the family of States, not so much to the need that commerce shall be regulated, as to the conviction, shared by the wisest men of the time, that the States ought not to be allowed to regulate it; and it may be affirmed that the provision was intended, not so much to enjoin a duty on Congress, as to tie the hands of the States. So far as inter-State commerce is concerned, the policy was then, as evinced by other provisions of the constitution, and has been throughout, to give entire freedom—that is, to leave it to regulate itself. Commerce has its origin and impulse in individual enterprise and flourishes most when left to be governed by its own laws. Its owes its prodigious growth in the United States to its complete freedom, and it is free

because the States surrendered their power over it and Congress has deemed it best not to exercise it. Accepting this truth, we are prepared to comprehend fully the meaning of the Supreme Court of the United States, speaking by Mr. Justice Field, in *Welton* v. *Missouri*, 91 U. S. 282 : "The fact that Congress has not seen fit to prescribe any specific rules to govern inter-State commerce does not affect the question. Its inaction on this subject, when considered with reference to its legislation with respect to foreign commerce, is equivalent to a declaration that inter-State commerce shall be free and untrammeled." This view has been repeatedly expressed by that court since. The power was not reserved to the States. They surrendered it, and it would be strange, indeed, if by a change in the method of transportation, or by the non-action of Congress, they have recovered the power. If the States have acquired the power by means of the railway, it is clear that the power of Congress extends to but a small fragment of that vast " traffic " and intercourse which excites the wonder of mankind. According to Marshall, in *Gibbon* v. *Ogden*, the commercial clause embraces traffic and intercourse, and it gives the power without regard to the methods employed. The suggestion is persuasive, that so long as Congress abstains the States may act, but it is plainly inadmissible, and so it is inadmissible to urge that the States are not likely to obstruct commerce and would be inclined to reduce its burdens. Speaking to this point, the same great judge said, in *Brown* v. *Maryland :* " Questions of power do not depend on the degree to which it may be exercised. If exercised at all, it must be at the will of those in whose hands it is placed." An inter-State railroad cannot be made to occupy a different footing, under the constitution, from that of the canal.

Mr. Justice Miller, in the case of *Clinton Bridge,* 1 Woolworth 151, speaking of the commerce moving by rail, said : " But are we to remit the most valuable part of it (inter-State commerce) to the control of the States through whose territories it must be conducted and to all the vexations and burdens which they may impose ? And must all this be permitted because carrying is done by a method not thought of when the constitution was framed ?"

And he concludes: "I have no doubt that the power of Congress applies to the "commerce carried on over any railroad which has voluntarily become part of any of these lines of inter-State communication."

*W. P. Harris* also made an oral argument.

CAMPBELL, C. J., delivered the opinion of the court.

It is claimed that the act creating the railroad commission is a violation of Art. 1, § 8, of the Constitution of the United States, which vests in Congress power "to regulate commerce * * * among the several States," because the railroad of the appellee connects at Jackson, Mississippi, with the railroad system of the country and at Yazoo City with the waterways, and its inter-State and local commerce and interests are inseparable without ruin. The question thus presented is, How far is the State disabled by the constitutional provision quoted from governing railroads within its limits as to fares and freights?

There is no denial of the power of Congress "to regulate commerce * * * among the several States," for that is plainly conferred; but what is it to regulate commerce? Prescribing rates of compensation for service rendered by a railway company does not appear to us to be regulating commerce. The right to compensation is an essential attribute of such a corporation. It is the power to exist. Prescribing rates is providing for the existence of the artificial being. It is breathing into it the breath of life, that it may become a living being. The power to do this belongs to the sovereignty that may create corporations and shape their being and define their functions. It must be the State. Its power to create corporations for the various purposes of business and commerce has been uniformly exercised and never questioned. If it may create such corporations it may determine their attributes and prescribe what they may charge for services rendered, as well as the other conditions of their existence. This belongs to the sovereignty of the State and is essential to the regulation of its internal police, and has not been surrendered to Congress. *People* v. *Babcock*, 11 Wend. 587; *Freeholders* v. *The State*, 4 Zabriskie

718. It is the sovereign power to govern the institutions of the State, and is not regulating commerce. It would seem to belong to the State alone, whose creature the corporation is, and whose right to shape its being, in this essential attribute, pertains to it because it is its creature; and such we understand to be the doctrine of the Supreme Court of the United States as announced in *Railroad Co.* v. *Maryland*, 21 Wall. 456, and other decisions.

The principle supporting the decision in *Railroad Co.* v. *Maryland* is the right of a State, as a sovereign, to regulate and control the rate of transportation over its creature, the railroad built under a charter by the State. It is recognized by the opinion of the court that, in the very nature of things, the State must have control of rates over highways of its own creation, even though to exercise this power involves, consequentially, an imposition on persons and property carried from State to State. The railroad extended from Baltimore to Washington, and the State required payment to it of a fixed portion of all money derived by the company from carrying passengers from Baltimore to Washington City, and the question was whether this exaction by the State in the charter of the company was "a restriction of free intercourse and traffic between the different States," and it was declared not to be such. The plain assumption was that, unless the provision in the charter was a restriction of free intercourse and traffic, it was clearly within the legitimate power of the State. It was said by the court "that the power to charge for transportation and the amount of the charge are absolutely within the control of the State;" and "this unlimited right of the State to charge or authorize others to charge toll, freight, or fare for transportation on its roads, canals, and railroads arises from the simple fact that they are its own works or constructed under its authority. It gives them being. It has a right to exact compensation for their use. It has a discretion as to the amount of that compensation." Attention was called by the opinion to the fact that when the constitution was adopted transportation on land was performed entirely on common roads and in vehicles drawn by animal power, and that "no one at that day imagined that the roads and bridges (except

when the latter crossed navigable streams) were not entirely subject, both as to their construction, repair, and mánagement, to State regulation and control.   They were all made either by the States or under their authority.   The power of the State to impose or authorize such tolls as it saw fit was unquestioned.   No one then supposed that the wagons of the country, which were the vehicles of this commerce, or the horses by which they were drawn, were subject to national regulation.   The movement of persons and merchandise, so long as it was as free to one person as to another, to the citizens of other States as to the citizens of the State in which it was performed, was not regarded as unconstitutionally restricted and trammeled by tolls exacted on bridges or turnpikes, whether belonging to the State or to private persons."

There is far more reason for denying authority to the State and claiming it for Congress as to the common roads which cross State lines than as to railroads.   They are much more numerous than railroads.   Their freedom from restriction is more important as affecting commerce on the borders of States than the freedom of railroads.

So in *Hall* v. *DeCuir*, 95 U. S. 485, the statute of Louisiana requiring common carriers of passengers to give all persons traveling in thát State, upon the public conveyances employed in such business, equal rights and privileges in all parts of the conveyance without distinction or discrimination oñ account of race or color was held to be a regulation of commerce and void, even within the State, so far as it affected vessels plying the waters of the Mississippi River between different States.   The reason was the steamboat was enrolled and licensed under the laws of the United States and engaged as a regular packet between different States upon the navigable waters of the United States.   The vessel was in a sense an institution of the United States, deriving its right to pursue its business from the United States and navigating the national highway common to all, and not the property of private persons or deriving its existence from a State.   As Congress had regulated the business by providing for licensing vessels and leaving the license free and untrammeled as to the accommodations of passengers, and as by the common law it pertains to the business of a

common carrier to make reasonable and suitable regulations as regards passengers, it was held that Louisiana had no right to add a requirement not imposed by Congress, which in regulating the matter had left the common law in force as to this. As it belonged to Congress to legislate on this matter and it had done so, the action of the State was unauthorized and void wherein it added to the requirements of Congress. Under the acts of Congress and the common law with reference to which they were enacted, the licensed carrier might adopt its own reasonable regulations for the accommodation of passengers. The statute of Louisiana abridged this right and hindered its free exercise. It violated the privilege of a grantee of the United States, and, therefore, was declared to be of no effect.

This seems to us the true foundation of that decision. It was said by the chief justice, in delivering the opinion, that "State legislation which seeks to impose a direct burden upon inter-State commerce or to interfere directly with its freedom does encroach upon the exclusive power of Congress." We adopt this view, and hold that even in prescribing rates of compensation, which pertains exclusively to the State authority, as we believe, if a direct burden was laid upon inter-State commerce or a direct interference with its freedom was attempted, it would necessarily fail because of the absence of power in a State, in view of the Constitution of the United States, to obstruct the freedom of commerce among the States.

Our view is that the State may regulate rates, but cannot in the exercise of this power obstruct the freedom of commerce among the several States. In the opinion cited a distinction is drawn between acting " upon the business through the local instruments to be employed after coming within the State " and acting " directly upon the business as it comes into the State from without and goes out from within." This seems to be a full recognition of the distinction we have endeavored to draw between the local instruments of commerce existing by authority of a State and within its limits, and the commerce which may be carried on over them. Grant that wherever commerce goes, whether by land or on water, the power of Congress goes to secure its freedom from hindrance or

discrimination by State authority, and it still remains true that the local instrument and vehicle of commerce, deriving its being from the authority of the State, is subject to its regulation in the essential attribute of earning a support and continuing to perform its functions and accomplish the end of its creation, and that the only limitation of the power of the State, with reference to commerce among the States, is to abstain from any obstruction of its freedom or any burden upon it.

It may be conceded that a State law requiring railway companies to give equal accommodations on cars going from State to State to all passengers would fall under the condemnation of the decision in *Hall* v. *DeCuir*, and it would not follow that State regulation of compensation for service must be denied, for there is a wide difference between the exercise of the right to live and act and those collateral matters which do not relate to the very existence of a being, but to its mere convenience.

Congress has not regulated railroads. They do not owe their existence to Congress. They do not operate by its license. They are State institutions and subject to State authority, in subordination to the constitutional inhibition of any restriction by the States of the freedom of commerce among the several States; not absolute freedom, but such freedom as makes no distinction between the rights of persons and things because of locality. The constitutional provision being considered was designed to prevent each State from legislating with reference to its own interest regardless of the interests of others. It should be so construed as to accomplish this end, and should be limited to that.

*Pensacola Telegraph Co.* v. *West*, 96 U. S. 1, was decided on the principle that a State may not obstruct or unnecessarily encumber an instrumentality of commerce and of government authorized by it.

In *Lord* v. *Steamship Co.*, 102 U. S. 541, the act of Congress limiting the liability of the owner of any vessel navigating the high seas between ports of the same State in certain cases specified in the act was upheld as a valid exercise of the power of Congress to regulate commerce.

In delivering the opinion, the chief justice lays stress on the fact

that the vessel, on her voyages between the ports of the State, entered on a navigation which was necessarily connected with other nations, because she went out of California and the United States and upon the ocean, the common property of all nations.

What analogy is there between a vessel navigating the ocean and a railroad situate wholly within a State, but connecting at the State line with a railroad in another State? Does it arise from the fact that these connecting roads afford a track for trains of cars to be drawn from State to State? While the train is in one State it is subject to its jurisdiction. The instant the State boundary is crossed the jurisdiction of another State attaches. The right of each State to govern within its limits must be upheld. This right to govern is limited only by the Constitution of the State and of the United States. The contention now being examined is that government by the State within its limits of such railroads is denied because Congress has power to regulate commerce among the several States. The reply is that the local instrument or vehicle of commerce existing in the State by its authority, including the trains while in the State, are subject to all such regulations adopted by the State for their government as are not, in their nature and effect, an imposition upon or a hindrance of free intercourse and traffic between the States. The State cannot, in regulating rates or in any other manner, discriminate against persons or products of other States or countries, but it may govern all within its limits impartially and justly. In the State, cars and cargo and passengers are amenable to its laws, although they will soon become subject to the laws of another State which possesses like power of control over them, subject to the constitutional restriction against burdening or hindering commerce. Any unauthorized restriction would fall by the silent operation of the Constitution of the United States, made effective through the courts; and it may be admitted that Congress could lawfully legislate on this matter to the extent necessary in its judgment to smooth the way of commerce carried on over railroads from State to State, as many contend, and still it would not follow that Congress can fix the rates of compensation for carriage in a State.

In *Telegraph Co.* v. *Texas,* 105 U. S. 460, it was decided that the business of a railroad or telegraph company " is commerce itself," and that a tax by the State for each message sent was unlawful as an imposition on messages sent beyond the State, but that is a widely different question from that of the right of a State to deal with the earning capacity of individuals or corporations.

Commerce among the different States must be free—not free from the cost of service, not to go without paying its way, but free from impositions on it the necessary effect of which is to hinder it.

In *Munn* v. *Illinois,* 94 U. S. 113, it was decided that the regulation of warehouses for the storage of grain, owned by private individuals and situated in Illinois, although " used as instruments by those engaged in State as well as those engaged in inter-State commerce," was a thing of domestic concern and pertained to the State. The warehouses were declared to be no more a part of commerce itself than the dray or the cart by which, but for them, grain would be transferred from one railroad station to another. This utterance was as to the effect of the power of Congress to regulate commerce; and it is observable that the distinguished judge who delivered a dissenting opinion in that case did not place his dissent on the ground that Congress had the power to regulate the storage of grain in the warehouses. This decision affirms the right of the State to regulate the business of one engaged in a public employment in that State, although that business consisted in storing and transferring immense quantities of grain in its transit from the fields of production to the markets of the world.

The regulation of a public employment conducted in a State by natural persons belongs to the State in whose jurisdiction they are. There can be no distinction between natural and artificial persons except this : Natural persons possess rights not conferred by the State, while corporations depend on the act of their creation for their rights and powers. They must exist and act as made by the authority which brings them into being. The State, being the creator of a corporation, must determine its attributes and functions, and it must, from the necessity of the case, act in obedience to the law of its being.

The State may not invade the domain of Congress and regulate commerce among the several States in creating corporations any more than in any other way, but as it is for the State to create corporations, and as they cannot live without earning money, the power to earn it and the limit of their right in this respect must be subject to the regulation of the authority of the State, because it is not regulating commerce. It is incidentally or consequentially affecting it, perhaps, but to deal with the local instrument of commerce in a manner vital to its existence is not regulating commerce in the sense of the constitution. It is providing for the very being of the corporation, just as the State protects the natural person in the enjoyment of all his rights.

Congress has supreme, and it may be conceded exclusive, power over commerce among the several States, and any attempt of the State to regulate this commerce or to fetter or burden or restrict it in any way is unconstitutional, but it is not everything which may incidentally or consequentially affect this commerce which is to be held void. A regulation of inter-State commerce as such is prohibited, but power may be legitimately exercised by the States in many ways over the instruments of commerce among the States and not be justly condemned.

So long as there is no discrimination against persons and things carried across State lines, or attempt to so regulate such movement as to affect it because it is across the State boundary, it cannot be said that there is an unwarranted interference with commerce among the States.

The railroad commission is not a restriction or hindrance of the freedom of commerce, but is intended to facilitate it and smooth its way by removing hindrances. The fear is professed that the commission will cripple or destroy the instruments of commerce. If there is danger of this, that cannot make any difference, so far as relates to the question now being discussed, because the creator may at pleasure destroy the work of its own power unquestioned as to the right to do it.

In *Peik* v. *Railway Co.*, 94 U. S. 164, it was held that the legislature of the State of Wisconsin had the power to prescribe

a maximum of charges to be made by a railroad company, whose road was connected by means of a bridge and a consolidation of companies with a railroad in another State, for transporting persons or property within the State, or taken up outside the State and brought within it, or taken up inside the State and carried without. The right of the State was put on the ground of the absence of action by Congress on the subject, and because of this it was said the State could provide for the people within the State, even though it might indirectly affect those without.   Of course, this reasoning implies the existence of power in Congress to regulate charges, which we question.

Congress has not attempted to regulate the charges to be made by railroad companies, and if the right of the State to act with reference to fares and freights carried across the boundaries of the State depends on the absence of congressional action, the right of the State must be upheld.

The authoritative declaration is that the power to regulate commerce among the several States is exclusively in Congress and denied to the States in all those cases where, from the nature of the subject, uniformity of regulation is required, and that as to these subjects the absence of congressional legislation is equivalent to a declaration that there shall not be any regulation, and any State legislation in such cases must fall before the silent but efficient power of the constitution.

We think that regulating rates for the transportation of persons and property does not fall within the class of matters requiring or admitting of uniformity.   Perhaps no subject admits of and demands greater diversity with varying localities and circumstances justly affecting the value of service.

If a State should build and operate a railroad connected with the railway system and navigable waters of the country for revenue, might Congress prescribe charges over it for persons and things *en route* beyond the limits of the State ?   May Congress regulate tolls and charges on the Erie Canal, connecting the navigable waters of the lakes with those in the East ?

Section 6 of the charter of the appellee confers on the company

62 MISS.—41

power to fix from time to time by its board of directors the rates at which it will transport persons or property over its railroads, provided they shall not exceed a maximum specified in the act.

The power to contract is an essential attribute of sovereignty and is of prime importance. Its exercise has been productive of incalculable benefits to society, however great may be the evils incident to its injudicious employment. It cannot be denied merely because of its liability to abuse. The power to contract implies the power to make a valid contract. Chartering railroad companies and other similar associations has long been an acknowledged and a favorite exercise of legislative authority. The right to grant charters includes the right to grant such as will be upheld. Conferring power on the grantee of the franchise to fix rates of compensation at discretion, or within prescribed limits fixed by the charter, has been the common practice of the legislatures of the States of the United States from an early period of their history. The right of the corporators to exercise the powers conferred by the act of incorporation, whether to fix rates themselves or to take those fixed by their charter, and to rest securely on its provisions in this respect, has hitherto been generally regarded as indisputable.

A grant in general terms of authority to fix rates is not a renunciation of the right of legislative control so as to secure reasonable rates. Such a grant evinces merely a purpose to confer power to exact compensation which shall be just and reasonable.

It is only where there is an unmistakable manifestation of a purpose to place the unrestricted right in the corporation to determine rates of compensation that the power of the legislature afterward to interfere can be denied. It is not to be presumed that the right of legislative control was intended to be renounced. Every presumption is against that. If the grant can be interpreted without ascribing to the legislature an intent to part with any power it will be done. Only what is plainly parted with is gone. Fixing rates in a charter is a specification of what is reasonable—an exclusion of tacit or implied conditions on the subject. It is an essential part of the contract of incorporation. the most important condition of its existence, the inducing cause of its acceptance.

That it was the legislative intent to vest in the appellee the unrestricted right to fix rates within the limits prescribed by the charter is clear ; that this was a valid contract by the State, obligatory and inviolable by it, we regard as settled authoritatively by Federal and State decisions too numerous for citation.

If anything is or ever can be settled in American constitutional law, the sanctity and inviolability of a contract between a State and individuals in the shape of a charter for a business enterprise, accepted and acted on by the corporators on the faith of its terms and provisions, must be so regarded.

The appellee has the unquestionable right from time to time, by its board of directors, to fix the rates at which it will transport over its railroads, provided those rates shall not exceed the maximum prescribed by the charter. That is the contract. These terms were expressly made. On the faith of them capital was invested and the enterprise set on foot. It is not allowable now for one of the contracting parties to interfere with the exercise by the other of its plainly granted rights. They are secured beyond the reach of legislation and cannot be impaired. The State cannot, by an act of its legislature, abdicate the right to govern artificial as well as natural persons, but it may create corporations, and where they are not a part of the machinery of government, the franchise cannot be resumed by the legislature or its benefits be essentially impaired without the consent of the grantee. To hold otherwise would be revolutionary and disturb the foundations of society as molded by the judicial utterances of half a century of constitutional government in America.

While the rates at which the appellee will transport over its roads, not exceeding what is stipulated for in the charter, is for the determination of the appellee and not subject to the control within the chartered limits of the State, it is indisputable that the State may create a commission or board by any name to see that the creature of the State keeps within its charter limits and violates none of its obligations as a common carrier. Whatever the charter rights of the appellee, there are many police regulations the State may lawfully adopt, and it may commit their enforce-

ment to any agency of its selection. It may intrust the oversight and supervision of the operations of railroads to a commission charged with the duty of guarding against abuses the State has the right to correct.

We do not feel called on to pass upon all of the numerous provisions of the act complained of, and will decide only so much as will properly dispose of this case, leaving other questions to be decided as they arise. The bill is to restrain the commission " from interfering with the tariff of charges of (complainant), or with the operation, control, or income of said railroad  *  *  *  *  and from  *  *  any revision of orator's tariff, or from instituting or aiding in the prosecution of suits for recovery of penalties under said acts, or doing anything under said acts as to orator."

In view of what is written, it must be held that the railroad commission cannot interfere with the rates fixed by the board of directors of the appellee from time to time for transporting persons and property over its railroad, if those rates are within the limits prescribed by the charter, and that the commission cannot adopt any rule or regulation as to rates violative of the clearly expressed or necessarily implied charter rights of the company ; but while this is true, the commission may investigate the control and operation of the company in order to ascertain that it is conforming to its authorization by the charter. It may do many things contemplated by the act creating it without any violation of the inviolable rights of the company. No reason is perceived why the company may not be required to submit its tariff of charges to the commission in order that it may see that it conforms to the limits fixed by the charter. So it may be said that the company has no right to make unjust discrimination or show partiality not authorized by its charter in transporting persons and things, and all this the commission may look after, and it may hear complaints as to any matter over which it has control as to the operations of the company.

We do not see why the appellee shall not be subject to the requirement of the thirteenth section of the act creating the railroad commission and be bound to give notice, as required by that

section, to the commissioners in case of any accident to a train attended with serious personal injury.   And we think the appellee is subject to the eighteenth section of the act as to a suitable reception-room at each depot and as to bulletin boards.

Our view is that the right this company has secured by its charter to fix rates and to manage its affairs by a board of directors, does not exempt it from such reasonable regulations as the State from time to time may see fit to adopt for the impartial government of railroads in the State for the interest of the people. This company may fix rates and collect them within the limits of its charter and may earn all it can within these limits, but it is a creature of the State, subject to its government and control, except wherein the State has renounced in plain terms its right of regulation and control.   The rights of the company, secured by its charter, must be upheld, and the railroad commission must abstain from any interference with these rights, but outside of these bounds and as to all those legitimate requirements of legislative authority prescribed in the interest of the community and consistent with the full enjoyment of its contract rights by the company, it must yield to the authority of the State to supervise it.

The act creating the railroad commission is not violative of the fourteenth amendment of the Constitution of the United States, or of any provision of the constitution of the State, in that it creates a commission and charges it with the duty of supervising railroads.

As before stated, we do not intend to express an opinion on all of the provisions of the act.   Many questions may arise under it not necessary to be now disposed of, and we leave them for consideration when presented.   We hold that the State had the right to create an agency of the State to exercise such supervision as it may lawfully employ over railroads within its limits and have declared the immunity from interference secured to the appellee by its charter, and this is all that is necessary to dispose of this case.

*Decree reversed, and decree made here to modify the injunction in accordance with this opinion.*